1

Pages:    1-36

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-CV-11504-RCL

*********************************

WILLIAM R. MITCHELL                        *

    Plaintiff                              *

vs.                                        *

WILLIAM D. MONGELLI                         *

    Defendant                              *

*********************************

**EXHIBIT**

**1**

DEPOSITION of WILLIAM R. MITCHELL, a Witness

called by the Defendant, taken pursuant to the

provisions of the Federal Rules of Civil Procedure,

before Peter J. Wood, a Professional Court Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at MCI Norfolk, 2 Clark Street,

Norfolk, Massachusetts, on Wednesday, June 21, 2006,

commencing at 10:10 a.m.

**WOOD COURT & CONFERENCE REPORTING**
**77 SUMMER STREET**
**COHASSET, MA 02025**
**(781) 383-6621**

12

1    A    Yes, this is September.

2    Q    What's the date on that?

3    A    The 28th.

4    Q    September 28, 2004?

5    A    Yes.  I think the first complaint was in August.

6         I'm not sure of the actual date.

7    Q    Is everything contained in these papers truthful?

8    A    Yes.

9    Q    Is there anything in them that you now know to be

10        inaccurate?

11   A    No.  It's what I wrote.

12   Q    I'd like to address now your retaliation claim

13        against Mr. Mongelli.  Could you explain to me

14        what did Mr. Mongelli do to you that you consider

15        to be retaliation?

16   A    All right.  I was talking in the library.  He

17        told me to be quiet.  He called me in his office

18        and told me I couldn't talk to anybody and that I

19        was too loud, and that I can't talk to the law

20        clerk.  So then I goes well, then -- this has

21        been going on for years.  I says Mr. Mongelli,

22        you know, I have a right to free speech and

23        access to the court.  He asked me if I wanted to

24        go there, and I started taking a little tantrum.

WOOD COURT & CONFERENCE REPORTING

13

1        So I says I was going to leave because

2     it's 10:30 movement, so he let me go after we had

3     a little discussion on it, and on my way out the

4     door, he called me back where he was standing

5     next to an officer there, and he goes tell him

6     what you just told me, and I said well, I'm not

7     going to get into any dialogue with an officer or

8     somebody else because I'll lose, so what I said

9     is I apologize for what I told you, and I'll see

10     you later, Mr. Mongelli, and I left.

11        So that's the retaliation because I

12     told him that I had a right to talk and access to

13     the courts and research in the law library, and

14     like my complaint says, this has been going on

15     for not just one day but it's been going on for a

16     while.  I haven't been down the library since all

17     this has been happening except on the weekends.

18     So I believe that because I told him that, that

19     he brought me to the officers for disciplinary

20     action.

21  Q   Is that the end of your answer?

22  A   Yes.

23  Q   Let's break that down a little bit.  You said

24     what Mr. Mongelli did was, first of all, call you

WOOD COURT & CONFERENCE REPORTING

14

1    to the officer in charge?

2  A   Upon leaving the library, yes, he called me over.

3  Q   What type of adverse action did you suffer for

4    being brought to the officer in charge?

5  A   The chilling effect I got put on the spot.  I'm

6    not going to argue with an officer.  I'm not

7    going to do that.  I'm not going to argue with an

8    officer, so I apologized.  I said I'm leaving,

9    I'll see you later, and he said that he would

10    probably write an incident report.

11  Q   Who said that?

12  A   Mr. Mongelli.  So I said okay, and I left.

13  Q   Did you ever receive a disciplinary report?

14  A   No, I did not.

15  Q   Can we agree, according to your amended

16    complaint, this incident took place on January

17    15, 2004?

18  A   Yes.  I made a mistake on the dates one time.  I

19    gave you a letter to explain it.  There was a

20    typographical error there.  When I was doing the

21    interrogatories, I was thinking 2005 when it was

22    actually January 15, 2004.

23  Q   So the date that this incident happened was

24    January 15, 2004?

WOOD COURT & CONFERENCE REPORTING

17

1    A    No.

2    Q    Is the library open in the afternoon on Sunday?

3    A    Yes, it is.

4    Q    What about on Saturdays when you go to the

5         library; do you go in the morning or afternoon?

6    A    In the mornings.

7    Q    What hours?

8    A    Same hours, 9:30 to quarter past 11:00.

9    Q    Why do you go on the weekends and not during the

10        week?

11   A    Because I don't want to get in confrontation with

12        Mr. Mongelli.

13   Q    But you agree with me, don't you, that he hasn't

14        told you that you can't come during the week?

15   A    No, he didn't.

16   Q    Has Mr. Mongelli told you that there are any

17        restrictions on you that would prohibit you from

18        attending the library?

19   A    No.

20   Q    I think I asked you this but I'll ask it again

21        anyway.  Did you receive a disciplinary report

22        for your behavior on January 15, 2004?

23   A    No.

24   Q    Mr. Mitchell, is it fair to say that on that

WOOD COURT & CONFERENCE REPORTING

18

1      date, you were using a loud voice in the library?

2   A   Not that I know of.  I thought I was talking

3      normal.

4   Q   You were talking like in the tone you're using

5      today?

6   A   It could have been a little louder, but I wasn't

7      disrupting anybody.  I think there was like four

8      people in the library, and we were ready to leave

9      when that happened.

10  Q   What do you mean you were ready to leave?

11  A   It's 10:30 movement.  I was on my way to go back

12     to the unit.

13  Q   So all this happened just before you were getting

14     ready to leave?

15  A   Absolutely.

16  Q   Were you engaging in any type of misbehavior on

17     that day?

18  A   No.  I was talking with his law clerks.

19     Actually, there was one that sits at the desk.

20  Q   Who was that?

21  A   I don't remember.  A guy named Larry.  I don't

22     think he works there anymore anyway, but it's a

23     guy named Larry I was talking to.

24  Q   Well, if you were not engaging in any kind of

WOOD COURT & CONFERENCE REPORTING

19

1      misbehavior, why did you apologize to Mr.

2      Mongelli?

3   A  Because I feel like that the confrontation that

4      we got into in the office over me telling him

5      that I had a right to free speech and access to

6      the court, that I would have been -- if I got in

7      any confrontations in front of the officers, so I

8      said well, I'm sorry, and that won't happen

9      again.

10  Q  What were you telling him would not happen again?

11  A  I didn't.  I just said whatever happened wouldn't

12     happen again.  I didn't specify anything,

13     whatever Mr. Mongelli thought that I did.

14  Q  I'd like to turn to Paragraph 30 of your amended

15     complaint.

16  A  Okay.

17  Q  Would you read the first sentence of Paragraph

18     30?

19  A  "Plaintiff has not been in the law library since

20     the incident especially when the librarian is

21     there and because he's worried and intimidated by

22     defendant William Mongelli and what his demeanor

23     would be like and would he do the next time

24     plaintiff appeared in the library."

20

1    Q    Was that an accurate statement?

2    A    Yes.

3    Q    Would you agree, though, that when you said you

4         had not been in the library since the incident,

5         that really was qualified by the fact that you

6         did go on the weekends?

7    A    Yes.  I say that in my complaint.

8    Q    So that's in the next sentence?

9    A    Yes.

10   Q    In the last sentence of Paragraph 30, you talk

11        about there's a downside of going to the library

12        on Saturdays and Sundays.  Could you explain what

13        the downside is?

14   A    The downside of it is that I cannot get legal

15        supplies.  I can't get copies on the copy

16        machine.  If I need an old supreme court report

17        or book, it's up in the archives upstairs, you

18        can't get access to that, and at the time, I was

19        doing a lot of research on the fed., so there was

20        some older case law up there that I was looking

21        for.

22   Q    Isn't it fair to say that you were able to obtain

23        supplies to write this amended complaint?

24   A    I was buying my own paper and stuff.  I buy my

WOOD COURT & CONFERENCE REPORTING

21

1    own ribbons.  I have my own typewriter.  The only

2    thing that I have, I have somebody get me is

3    these manila envelopes.  I have somebody that

4    gets me those, but you can buy them in the

5    canteen, also, which I was doing.  I don't have

6    money like that all the time to be buying

7    supplies every day, so sometimes you have to go

8    down to the library to get it.

9    Q    So when you say you couldn't obtain supplies,

10       what you meant is you couldn't obtain any free

11       supplies from Mr. Mongelli?

12   A    Oh, not that they were free, no.  That's not what

13       that means, either.  I don't say free supplies

14       there.

15   Q    Well, when you said you can't obtain any legal

16       supplies, the fact is you could obtain legal

17       supplies through the canteen?

18   A    Yeah, on my own.

19   Q    Purchasing them out of your own canteen money?

20   A    Yes, and if and when my family sends me money,

21       yes.  There's other times where I don't have it,

22       and I have to depend on the library for supplies,

23       especially back in this -- around this time, I

24       think, I was having problems anyway.

WOOD COURT & CONFERENCE REPORTING

22

1    Q    When you say that the copy machine is not in

2          operation on the weekends --

3    A    No, it's not.

4    Q    -- how were you able to get a copy of this

5          amended complaint to serve on Mr. Mongelli?

6    A    This one here, I had a friend of mine that worked

7          there, and he copied it for me.  He was a law

8          clerk.  He's not here anymore.  As a matter of

9          fact, I still have guys copy for me.

10    Q    The copies that you do obtain, you do have a way

11          that you can obtain copies of your legal

12          documents?

13    A    Sometimes the guys that I know that are going up

14          there, I ask them to copy something for me, so I

15          don't have to go up there and wait in the line

16          and just go through the whole thing.

17    Q    Have you ever yourself gone to the library to get

18          copies made since January 2004?

19    A    I think two times I went up there.  Once was to

20          get copies a couple of months ago because the guy

21          that I was going to ask for copies for wasn't

22          going to the library that day, and I had

23          emergency stuff to get in the mail the next day,

24          so I had to go myself.

23

1    Q    You said this was a couple of months ago?

2    A    Yeah, I think it was a couple of months ago. It

3          was something I had to copy. I don't remember

4          what it was, though, something I had to get in

5          the mail.

6    Q    Was Mr. Mongelli there that day?

7    A    Yes, he was.

8    Q    Did you have any interaction with him?

9    A    Yeah, I had some dialogue. There's a form you

10         have to fill out, and he has to go through all of

11         your stuff now and sign it.

12    Q    Did he allow you to make copies?

13    A    Yes, he did.

14    Q    Did he say anything negative to you when you saw

15         him?

16    A    No.

17    Q    How about on the second occasion? You mentioned

18         there were two occasions.

19    A    I went up there to give somebody some work. They

20         were supposed to meet me there, and they never

21         met me, so I just was sitting down at the table.

22         I didn't get into any dialogue with Mr. Mongelli,

23         nor did I go in the copy line for anything, just

24         two or three times.

24

1    Q    What did you say about two or three times?

2    A    I said that was it, one time with him, and maybe

3         another time after that I went up there.  That

4         was it.  I usually go, like I said, on the

5         weekends to avoid any problems.

6    Q    Those two other occasions when you went during

7         the week and Mr. Mongelli was there, did he allow

8         you to stay in the library --

9    A    Yes.

10   Q    -- as long as you wanted?

11   A    Yes, he did.  I didn't say anything about that.

12   Q    Or at least until the library closed?

13   A    Absolutely.

14   Q    Still, I want to explore what you say is the

15        downside of going to the library on the weekends.

16        How did that interfere with your ability to

17        pursue your other legal cases?

18   A    I don't think that's relevant because it's a

19        retaliation claim here, not an access to the

20        court claim.  I lost that claim, as you know

21        yourself.  I lost that claim on access to the

22        court because it showed that I had the ability to

23        get it, and I had access to the court.  You got

24        to show actual injury.

WOOD COURT & CONFERENCE REPORTING

28

1           other guys in the library?

2    A      I have no idea what goes through Mr. Mongelli's

3           mind.  All I know is that no matter where I am or

4           who I'm talking to in the law library, he tells

5           me to be quiet, move my stuff, get out of the

6           way, go sit down.  I mean, it's constant, so I

7           don't even go anymore because of that.  I used to

8           hang in there all the time for years.

9    Q      Now you do go on weekends, though?

10   A      Yes.

11   Q      Mr. Mongelli doesn't work on the weekends there

12          in the library?

13   A      No, he don't.

14   Q      Are you claiming that Mr. Mongelli's actions

15          caused you to suffer any emotional distress?

16   A      I said that in my complaint somewhere, chilling

17          effect.

18   Q      What injury did you suffer because of Mr.

19          Mongelli's actions?

20   A      Well, that would be the injury.

21   Q      The chilling effect?

22   A      Chilling me from going to the library, scared to

23          talk to anybody if I am in there without some

24          kind of repercussion from him all the time.  I

WOOD COURT & CONFERENCE REPORTING

29

1        have no idea why he just zeroed in on me.  I've

2        seen him tell other guys to be quiet, but it was

3        like when I'm in there, it was me.

4    Q   Did you find that to be emotionally stressful?

5    A   Yes.

6    Q   Did you suffer any physical symptoms for

7        emotional distress?

8    A   I have a nervous condition to begin with, and I

9        get upset real easy.  Yes, I mean, if someone's

10       always constantly telling you to shut up all the

11       time, yeah, it gets to you.  It impedes my

12       ability to do my job or think clearly, or if I'm

13       doing something with somebody, it distracts me

14       from what I'm concentrating on, yes, it does.  It

15       disrupts.

16   Q   Do you have any physical symptoms that result

17       from that?

18   A   Physical symptoms, no.

19   Q   For example, upset stomach or --

20   A   I take Pepcid for an upset stomach, and I take

21       Motrin.  That's not for stress.  They don't treat

22       me for stress here.

23   Q   Have you sought any mental health counseling for

24       emotional distress?

34

1    DEPOSITION OF WILLIAM R. MITCHELL

2    RE:    WILLIAM R. MITCHELL V. WILLIAM D. MONGELLI

3    DATE:  JUNE 21, 2006

4        I, Peter J. Wood, a Massachusetts Court

5    Reporter and Notary Public duly commissioned and

6    qualified in and for the Commonwealth of

7    Massachusetts, do hereby certify that there came

8    before me on the 21st day of June, 2006, the person

9    hereinbefore named who was by me duly sworn to testify

10   to the truth and nothing but the truth of his

11   knowledge touching and concerning the matters in

12   controversy in this cause; that he was thereupon

13   examined upon his oath, and his examination reduced to

14   transcript; and this is a true record of the testimony

15   given by the witness.

16       I further testify that I am neither attorney or

17   counsel for, nor related to or employed by any of the

18   parties hereto or financially interested in the

19   action.

20       IN WITNESS HEREOF, I have hereunto set my hand

21   and notarial seal this _23_ day of _____, 2006.

22   My Commission Expires:

23   1/16/2009                        Peter J. Wood

24

WOOD COURT & CONFERENCE REPORTING

36

1  PLEASE ATTACH TO THE DEPOSITION OF:

2  WILLIAM R. MITCHELL

3  RE:   WILLIAM R. MITCHELL V. WILLIAM D. MONGELLI

4  DATE:  JUNE 21, 2006

5              E R R A T A   S H E E T

6  PAGE        LINE        CHANGE           REASON

7  12          24          "I" to "He"      Type O

8  27          5           "tell him"       Type O
                           to "telling him"

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15        I have read the foregoing transcript of my

16 deposition and, except for any corrections or changes

17 noted above, I hereby subscribe to the transcript as

18 an accurate record of the statements made by me.

19        Executed this __ day of __August__, 2006.

20

21        _William R. Mitchell_

22              WILLIAM R. MITCHELL

23

24

WOOD COURT & CONFERENCE REPORTING